# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2013-KA-01551-COA

ETHAN M. SMITH A/K/A ETHAN MICAH SMITH          APPELLANT

v.

STATE OF MISSISSIPPI          APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 06/13/2013 |
| TRIAL JUDGE: | HON. LISA P. DODSON |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: JUSTIN TAYLOR COOK |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: BILLY L. GORE |
| DISTRICT ATTORNEY: | JOEL SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF MURDER AND SENTENCED TO LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS |
| DISPOSITION: | AFFIRMED: 01/27/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE LEE, C.J., ISHEE AND FAIR, JJ.**

**LEE, C.J., FOR THE COURT:**

## PROCEDURAL HISTORY

¶1.     A jury in the Harrison County Circuit Court found Ethan M. Smith guilty of murder. The trial court sentenced Smith to life in the custody of the Mississippi Department of Corrections. Smith filed post-trial motions, which were denied by the trial court. Smith now appeals and asserts that (1) the trial court erred in refusing jury instructions D-1A and D-3,

(2) the evidence was insufficient to support the verdict, and (3) the verdict is against the overwhelming weight of the evidence.

FACTS

¶2. On or about March 28, 2011, Smith, Eric Midkiff, Kameron Dixon, Jacindo Vo, and Rikki Treloar[1] were inside a pop-out camper in the yard of Dixon's home. Smith, Midkiff, and Dixon had been drinking vodka, but according to witnesses, no one appeared intoxicated. Smith pulled out a gun and started playing with its safety features. Midkiff, Vo, and Treloar watched as Smith made a "bullet fall out the side." He gave the gun to Midkiff, who handled it for a time. There is conflicting testimony as to whether Midkiff played with the safety features of the gun. Treloar testified that there was at least one bullet in the gun. At no point did either of them point the gun at anybody. There was no horseplay. Midkiff handed the gun back to Smith, who put the gun on, near, or under the bed.

¶3. After Smith put the gun away, Smith, Midkiff, Vo, and Treloar lay down on the bed. Midkiff's left arm was draped over Vo, and they were facing Smith and Treloar. Dixon was playing video games on the other side of the camper. He was facing the bed.

¶4. Vo testified that at some point while the four of them were on the bed, Smith told Midkiff to leave in three seconds or he was going to shoot him. Vo testified that when Midkiff said he did not want to leave, Smith asked a second time. Vo testified that she saw Smith grab the gun and lean over her to get to Midkiff. The next thing Vo heard was a gunshot. Everyone ran out of the camper. Vo and Treloar got in Treloar's car. Smith, still holding the gun, told them to leave. Vo testified that Smith seemed angry and was "flipping

---

[1] The trial transcript refers to Rikki Trelear. Other documents refer to Rikki Treloar.

out." When asked if Smith was acting like it was an accident, Vo said no.

¶5. Treloar testified that as they were lying on the bed, Smith was texting her, asking her to stay because he wanted to have sex. They had been engaging in sexual relations for about a year or two. She testified that Smith told her he wanted everybody to leave. Treloar testified that at some point, Smith tried to get everybody to leave. She testified that when they would not leave he told them they had three minutes to leave. Treloar testified that Midkiff refused to leave without Vo. She testified that about a minute later, Smith leaned over her and the gun went off. Treloar testified that Smith said, "I shot him." Everyone ran out of the camper. Smith, still holding the gun, told them to leave. Treloar testified that Smith was panicking.

¶6. Dixon testified that Smith told everyone he wanted them to leave eventually. Dixon testified that when nobody left, Smith told Midkiff to leave. Dixon testified that he told Smith to "chill out." No one left. Dixon testified that a short time later, Smith told Midkiff that he had three seconds to leave or he was going to shoot him. Dixon testified that when Midkiff did not leave, Smith reached over, put the gun to Midkiff's head, and shot him. Dixon said that when he saw Smith put the gun to Midkiff's head, he stood up and told them to "chill out." When asked if he thought the safety was on, Smith said yes. After Smith shot Midkiff, Dixon ran to his mom's house to tell her not to enter the camper. Dixon testified that when he returned to the camper, Smith called 911 and told dispatch that his friend had shot himself in the head and asked what to do with him. Smith was told to lay Midkiff flat. Dixon helped Smith lay Midkiff flat, then he went back to his mom's house and locked himself in her room. Dixon told police that Midkiff had jumped on Smith's bed and broken

3

his bed support. He told police Smith was angry with Midkiff when he shot him.

¶7. Carl Fullilove, a forensic scientist assigned to the firearms and tool-mark-identification unit of the regional crime laboratory, testified that the gun found at the scene had five different safety features. He testified that this type of firearm was one of the safest firearms he had handled and that accidental discharge of this firearm was unlikely. When asked to clarify what he meant by accidental, he said that all the safety features would have to malfunction. Fullilove also testified that it would take three and three-quarter pounds of pressure to pull the trigger with the hammer already cocked and eleven pounds of pressure to pull the trigger otherwise.

¶8. Paul McGarry, a forensic pathologist, performed the autopsy on Midkiff. He testified that the entry wound indicated the gun was pressed tightly against the skin when the gun was fired. Chad Suggs, a gunshot-residue analyst, testified that Smith had gunshot residue on his hands, which meant "[he] discharged the firearm, [was] in close proximity to a discharged firearm[,] or handled something with gunshot residue on it." Terry Hines, the lead investigator, testified that when he came into contact with Smith, about two hours after the incident, he did not show any signs of prior alcohol consumption. Marty Griffin, one of the police officers who responded to the scene, observed Smith. He testified that Smith appeared calm. When asked if Smith appeared belligerent or intoxicated, Griffin answered no.

DISCUSSION

## I. JURY INSTRUCTIONS D-1A AND D-3

¶9. Smith contends the trial court committed reversible error by refusing jury instruction D-1A, which instructed the jury on culpable-negligence manslaughter. Regarding lesser-

4

included-offense jury instructions, the Supreme Court has said:

> We review a trial judge's denial of a lesser-included-offense jury instruction de novo. While "a defendant is entitled to have jury instructions given which present his theory of the case," we have held that "the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence." To be entitled to a lesser-included-offense instruction, "a defendant must point to some evidence in the record from which a jury reasonably could find him not guilty of the crime with which he was charged and at the same time find him guilty of a lesser-included offense." We must view the evidence in the light most favorable to the defendant, draw all reasonable inferences in his favor, and take into account "that the jury may not be required to believe any evidence offered by the State." But if no reasonable jury could have found the defendant guilty of the lesser-included offense, we will uphold the denial of the proposed instruction.

*Gilmore v. State*, 119 So. 3d 278, 286 (¶13) (Miss. 2013) (internal citations omitted).

¶10. "[C]ulpable negligence may be defined as the conscious and wanton or reckless disregard of the probabilities of fatal consequences to others as the result of the willful creation of an unreasonable risk." *Johnson v. State*, 997 So. 2d 256, 259 (¶6) (Miss. Ct. App. 2008) (quoting *Jones v. State*, 678 So. 2d 707, 710-11 (Miss. 1996)). "An intentional act that causes death cannot constitute culpable negligence." *Goff v. State*, 778 So. 2d 779, 782 (¶6) (Miss. Ct. App. 2000) (citing *Hurns v. State*, 616 So. 2d 313, 321 (Miss. 1993)). In cases where a conviction for culpable-negligence manslaughter was upheld, there was at least some evidence of negligence. *See Tait v. State*, 669 So. 2d 85, 89-90 (Miss. 1996) (eyewitness testimony that there was horseplay, the gun went off, and the defendant fell to the ground crying; there was no testimony indicating that the gun was the defendant's, that he knew it was loaded, or that he pulled the trigger); *Strode v. State,* 406 So. 2d 820, 821-22 (Miss. 1981) (testimony by defendant that he was horsing around with the gun, that he did

not know it was loaded, and that the gun slipped and went off as he tried to catch it); *Jernigan v. State*, 305 So. 2d 353, 354 (Miss. 1974) (testimony by defendant that he pulled the gun out of his shirt, it discharged by accident, he did not think the gun was loaded, and he and the victim "pranked" each other in this manner frequently); *Johnson*, 997 So. 2d at 260 (¶11) (testimony by defendant that the gun fired even though his finger was barely on the trigger and that he never meant to kill anyone).

¶11. In viewing the evidence in the light most favorable to Smith, there is no evidence to support a culpable-negligence-manslaughter instruction. There was no evidence of horseplay. No one pointed the gun at anyone anytime prior to the shooting. There is nothing to indicate the gun misfired or was shot by accident. Smith threatened Midkiff that if he did not leave, he was going to shoot him. Midkiff did not leave, so Smith put the gun to Midkiff's head and shot him. Smith proceeded to call 911 and told dispatch that his friend had shot himself in the head. Because we find no evidence of culpable negligence, this issue is without merit.

¶12. Smith also contends the trial court committed reversible error by refusing jury instruction D-3, which instructed the jury on excusable homicide by accident and misfortune. Using the language from Mississippi Code Annotated section 97-3-17(b) (Rev. 2014), instruction D-3 stated the following:

> The Court instructs the Jury that the killing of any human being by the act, procurement or omission of another shall be excusable when committed by accident and misfortune, in the heat of passion upon any sudden and sufficient provocation.
>
> If you believe from the evidence that Ethan Micah Smith killed Eric Wayne Midkiff by an act committed by accident and misfortune, in the heat of passion

upon sudden and sufficient provocation[,] then you shall find Ethan Micah Smith not guilty.

As with culpable negligence, "[a]n intentional act cannot fit the doctrine of accident or misfortune." *Montana v. State*, 822 So. 2d 954, 962 (¶33) (Miss. 2002). In cases that have found a sufficient evidentiary basis for an instruction on accident and misfortune in the heat of passion, there was at least some testimony that the killing was an accident. *See Clayton v. State*, 106 So. 3d 802 (Miss. 2012); *Evans v. State*, 797 So. 2d 811 (Miss. 2000); *Day v. State*, 589 So. 2d 637 (Miss. 1991). As stated above, there is nothing to indicate that the gun misfired or was shot by accident.

¶13. Furthermore, there was no evidence Smith was acting in the heat of passion upon sudden and sufficient provocation. In *Thomas v. State*, 818 So. 2d 335, 350 (¶55) (Miss. 2002), the Mississippi Supreme Court found that the trial court properly refused an instruction on accident and misfortune in the heat of passion where there was no evidence of "a state of violent and uncontrollable rage." (Quoting *Mullins v. State*, 493 So. 2d 971, 974 (Miss. 1986)). In that case, the victim came out of his house with his hands in his pockets, told the defendant, "I told you what I was going to do to you," and pushed the defendant. *Id.* The defendant pulled out his weapon and "it was fired." *Id.* In this case, Smith told Midkiff to leave. Midkiff told him he was not going to leave without Vo, so Smith put the gun to Midkiff's head and shot him. There was no uncontrollable rage, as there was no evidence of sudden and sufficient provocation. In *Clayton*, an escalating argument where the defendant's wife picked up a knife and had it drawn back to stab the defendant was sufficient evidence to warrant the giving of an instruction on accident and misfortune in the heat of

7

passion. *Clayton*, 106 So. 3d at 806 (¶10). Here there was no such argument. There was no struggle. Midkiff's arm remained draped around Vo until he was shot. He did not reach for the gun or in any way try to defend himself. This issue is without merit.

## II. SUFFICIENCY OF THE EVIDENCE

¶14. Smith contends the evidence was insufficient to support the guilty verdict. In reviewing the sufficiency of the evidence, "the critical inquiry is whether the evidence shows beyond a reasonable doubt that [the] accused committed the act charged, and that he did so under such circumstances that every element of the offense existed[.]" *Bush v. State*, 895 So. 2d 836, 843 (¶16) (Miss. 2005) (citation and internal quotation marks omitted). If, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found, beyond a reasonable doubt, that the essential elements of the crime existed, this Court will affirm the conviction. *Id*. Furthermore, it is well-settled law that the jury determines the credibility of the witnesses and resolves conflicts in the evidence. *Davis v. State*, 866 So. 2d 1107, 1112 (¶17) (Miss. Ct. App. 2003).

¶15. Mississippi Code Annotated section 97-3-19(1)(a) (Rev. 2014) defines deliberate-design murder as "[t]he killing of a human being without the authority of law by any means or in any manner . . . when done with deliberate design to effect the death of the person killed, or of any human being[.]" The State must prove beyond a reasonable doubt that: "(1) the defendant killed the victim; (2) without authority of law; and (3) with deliberate design to effect his death." *Brown v. State*, 965 So. 2d 1023, 1030 (¶27) (Miss. 2007) (quotations omitted). "[D]eliberate design to kill a person may be formed very quickly, and perhaps only moments before the act of consummating the intent." *Id*. at (¶28) (citations and

8

quotations omitted). "[D]eliberate-design connotes an intent to kill and may be inferred through the intentional use of any instrument which, based on its manner of use, is calculated to produce death or serious bodily injury." *Id*. (citation omitted).

¶16. The testimony of the three eyewitnesses was virtually the same. Smith told Midkiff that if he did not leave, he was going to shoot him. This manifested his intent. When Midkiff refused to leave, Smith put the gun to Midkiff's head and shot and killed him. Midkiff had been lying down with his arm around Vo. There was no evidence that Midkiff threatened or provoked Smith. Midkiff did not reach for the gun. There was no struggle. Fullilove testified that the gun Smith used had five safety features and that an accidental discharge was highly unlikely. Viewing the evidence in the light most favorable to the State, a rational juror could have found beyond a reasonable doubt that Smith was guilty of deliberate-design murder. This issue is without merit.

### III. WEIGHT OF THE EVIDENCE

¶17. Smith contends the guilty verdict is against the overwhelming weight of the evidence. "When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Bush*, 895 So. 2d at 844 (¶18). The evidence is viewed in the light most favorable to the verdict. *Id*.

¶18. Smith's arguments are similar to those expressed in the previous issue. From the evidence described in the previous issue, we cannot find that allowing the verdict to stand would sanction an unconscionable injustice. This issue is without merit.

9

¶19. THE JUDGMENT OF THE HARRISON COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HARRISON COUNTY.

IRVING AND GRIFFIS, P.JJ., ISHEE, ROBERTS, CARLTON, MAXWELL, FAIR AND JAMES, JJ., CONCUR. BARNES, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.